Filed 2/21/14  P. v. Kim CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>STEPHENSON CHOI KIM,<br><br>    Defendant and Appellant. | G046932<br><br>(Super. Ct. No. 04WF0953)<br><br>O P I N I O N |

        Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

        Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

INTRODUCTION

Defendant Stephenson Choi Kim entered the Fifth Wave Café in Cypress, believing a group of rival gang members was seated at a table in the back of the café. Defendant opened fire, killing one victim and injuring four others. Defendant was charged with and convicted of one count of murder, six counts of attempted murder, and one count of street terrorism. The jury found true the special circumstances allegations and the sentencing enhancement allegations for firearm discharge and gang-related activity. Defendant raises several challenges to his conviction and his sentence. We reject each of defendant's challenges and affirm the judgment.

First, defendant argues the trial court erroneously denied a motion to suppress evidence seized from defendant's computer. We conclude there was probable cause to issue the search warrant for defendant's computer, and the trial court did not err in denying defendant's motion.

Second, defendant argues the trial court violated his constitutional right to present a defense by excluding the videotaped statement of one of the attempted murder victims, in which the victim identified someone else as the likely shooter. The excluded statement was hearsay and did not have sufficient indicia of reliability to justify its admission. The trial court's application of the rules of evidence did not improperly deprive defendant of his right to present a defense.

Third, although the trial court erred in instructing the jury with the "kill zone" theory of liability for attempted murder, the error was harmless. There was sufficient evidence to support defendant's convictions for attempted murder based on the standard instruction for that crime, with which the jury was also instructed.

Fourth, there was sufficient evidence to support defendant's convictions for the attempted murders of those persons who were not struck by a bullet.

2

Fifth, we decline to order that the restitution order be modified to reflect that defendant's liability is joint and several. Our decision is without prejudice to defendant filing a motion in the trial court to modify the restitution order.

Finally, we decline to strike the parole revocation restitution fine imposed by the trial court. Although there may be virtually no chance that defendant will ever be paroled, a determinate sentence was imposed and not stayed, and the imposition of the parole revocation fine was therefore mandatory.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

On March 13, 2004, defendant, Ashil Nair, Glenn Watkins, Christopher Ung, Robin Kim, Chakris Kanchanapoomi, and Wilson Sun met at Johnny Tran's house, with a plan to go "gangbanging"; all but Robin Kim were members of the Satanas criminal street gang.[1] The group left in several different vehicles: Defendant drove his Toyota Tundra truck, with Robin Kim and Jessica Kwan (defendant's girlfriend) as passengers; Sun drove Nair's green Ford Explorer, with Ung, Watkins, and Nair as passengers; Tran and Kanchanapoomi were in a white Honda Civic driven by and belonging to Maurice, a cousin of a Satanas gang member; and Cindi Minh was driving a black Honda Accord.

Robin Kim had a .45-caliber gun and a submachine gun with him. The caravan of vehicles eventually ended up at the Fifth Wave Café in Cypress.

Nair and Watkins, who were both armed, walked into the café, looking for rival gang members. Venus Hyun, Jean Lee, Michael Paek, John Chung, Ronald Woodhead, Richard Woodhead, and Kung John Yoo were seated together at a table in the back of the café.[2] Nair and Watkins approached the group, and Nair asked where they

---

[1] After being arrested in connection with this case, Robin Kim was "jumped into" the gang while in custody.

[2] We will refer to Richard Woodhead and Ronald Woodhead by their first names to avoid confusion; we intend no disrespect.

3

were from or what gang they claimed. Either Richard or Ronald told Nair they did not want to fight, and they were just there to have a good time; he also said they did not gangbang.

Nair continued to aggressively ask the group where they were from. Nair also said, "fuck Sarzana. We're STS." Eventually, Richard said, "FMS," which stands for Family Mob gang; when he was younger he had been associated with the Family Mob gang, but he no longer had any ties to the gang.

Nair and Watkins left the café through the front door. Nair went to defendant's truck and told him there were "some fools from FMS" inside the café. Defendant got out of his truck, and put on a black baseball cap belonging to Sun. Defendant asked Robin Kim for his gun; Robin Kim gave the .45-caliber gun to defendant who "racked" a round into it. Nair told defendant the FMS gang members were at a table in the back corner of the café.

Defendant walked into the café, pointed the gun at the group at the table, and fired several shots. Defendant then walked out of the back door. Ronald went after defendant; defendant shot him in the stomach. Robin Kim, who was by then driving defendant's truck, picked defendant up, and all the vehicles drove back to Tran's house.

At Tran's house, defendant told the others he had walked up to a table at the café and fired a few rounds. Defendant also said that as he was leaving the café, someone grabbed him from behind; defendant shot that person and ran out the back door. Defendant told the others he had dropped the black cap he had been wearing. Defendant took Robin Kim's gun, got in his own truck, and left.

Hyun, a 21-year-old woman, had been shot in the back. She bled to death as a result of gunshot wounds to the lung and brain, when the bullet ricocheted off a rib and entered her skull cavity. Lee had been shot in the back. Paek was shot in the right hand. Chung was shot in the arm. Ronald was shot in the abdomen; although he

4

recovered from his injuries, he died of unrelated causes before trial. Richard and Yoo were not hit.

Crime scene investigators recovered four cartridge casings inside the café, and two more in the alley just outside the café's back door; four bullets or fragments were recovered from the scene, and one bullet was recovered from Hyun's body. The casings were Winchester .45-caliber automatic ammunition. A black cap found in the alley tested positive for Sun's DNA; defendant was eliminated as a contributor of DNA on the cap.

Seho Park, a waiter at the café, was interviewed by the police after the shooting. Park saw two men enter the café, and proceed toward a table in the back; he "didn't have a good feeling about it." From a photographic lineup, Park identified Nair as one of the two men who entered the café. Park told police investigators that after the two men left, a third man entered, walked straight to the back table, removed a gun from his pocket, and started shooting.[3] Park heard between five and seven shots. As the shooter was leaving the café, one of the victims pushed him. Park described the shooter as an Asian male about five feet, eight inches tall, with a husky build, wearing a black baseball cap and a dark gray jacket, with both hands in the front pockets of the jacket.

Park identified defendant as the shooter from a photographic lineup. Three days later, Park was unable to identify defendant's picture from a different six-pack photographic lineup. At trial, Park testified that although defendant's picture most closely resembled the shooter, he could not positively identify defendant as the shooter. Before testifying, Park saw a newspaper article about the shooting with defendant's picture; Park thought the person in the picture looked like the shooter.

Lee was unable to identify anyone from a six-pack photographic lineup. At trial, Lee testified Nair looked most like the individual who initially approached the table, but could not identify defendant as the shooter. Richard and Paek were not able to

---

[3] At trial, Park recanted his statements about having seen the shooting.

identify anyone from a photographic lineup.  Chung identified Nair as one of the two men who initially approached the group before the shooting.

The day after the shooting, when defendant learned Hyun had died, he expressed remorse.  About a week later, defendant met with Robin Kim and Nair.  Defendant told Nair not to say anything to anyone about the shooting, and threatened to kill him if he did; Nair believed that defendant was serious.  Defendant also said he wanted to keep Robin Kim's gun and would get rid of it.

Defendant was arrested several months later.  While he was being booked into custody, defendant asked if "this was about the murder."  Robin Kim, Ung, Kanchanapoomi, Nair, Watkins, and Sun were all arrested; all entered proffer agreements with the prosecution, and all testified against defendant at trial.  While in a holding cell at the preliminary hearing, defendant told Robin Kim he threw the gun off the Huntington Beach Pier so it would not be found by the police.

While in custody, defendant told Sun, "don't snitch."  Also, while in custody, defendant passed a "kite" to Watkins, reading:  "What's up, little homie.  A dogg, I know you talked 2 the cops and told 'em everything.  I already know, homie.  I'm telling you we have a good chance of fighting this case.  They can't use your confession in trial.  They can only use it on the preliminary hearing.  And trial you'll have to testify.  But you don't wanna do that.  If you testify, you know what's up.  [¶] Homie, we have to stick together on this.  Don't let the D.A. scare you.  If you take a deal, you're going to do time for sure.  Plus they'll stick you with more cases and you'll become a snitch.  That's not the way to do shit.  If we fight this case, we can beat it.  [¶] All the evidence they have is the homies pointing fingers.  But if we stop that and come together, they won't have shit or any evidence.  I'm making sure the victims don't testify, so don't worry.  [¶] Just listen to me.  I know what's up.  If I go down, all of you go down.  Just don't get weak.  I know it's scary but don't make this case harder.  And if we lose, we can appeal.  If you plea bargain, you can never appeal.  Just listen to me."

6

Defendant was charged with one count of first degree murder (count 1). (Pen. Code, § 187, subd. (a).) The information alleged as a special circumstance that defendant intentionally killed Hyun while an active participant in a criminal street gang, to further the activities of the gang. (*Id.*, § 190.2, subd. (a)(22).) Defendant was also charged with six counts of premeditated attempted murder (counts 2 through 7) (*id.*, §§ 187, subd. (a), 664, subd. (a)), and one count of street terrorism (count 8) (*id.*, § 186.22, subd. (a)). The information alleged that defendant personally discharged a firearm causing great bodily injury (counts 2 through 5) or death (count 1). (*Id.*, § 12022.53, subd. (d).) With respect to counts 6 and 7, the information alleged that defendant personally and intentionally discharged a firearm. (*Id.*, § 12022.53, subd. (c).) The information also alleged that, with respect to counts 1 through 7, defendant committed the crimes for the benefit of, at the direction of, or in association with a criminal street gang. (*Id.*, § 186.22, subd. (b).)

A jury found defendant guilty of all charges, and found true all special circumstance enhancement and sentencing enhancement allegations. In the penalty phase of the trial, the jury deadlocked on a death sentence, and the prosecution elected not to proceed with a second penalty trial.

Defendant was sentenced to a total term of life without the possibility of parole, plus 215 years to life, as well as a 40-year determinate sentence. The trial court sentenced defendant to life without the possibility of parole for count 1, plus consecutive terms of 15 years to life with the possibility of parole for each of counts 2 through 7, plus consecutive terms of 25 years to life for each of the firearm enhancements attendant to counts 1 through 5, plus consecutive determinate terms of 20 years for each of the firearm enhancements attendant to counts 6 and 7. Pursuant to Penal Code section 654, the trial court stayed execution of sentence on count 8.

7

I.

*SEIZURE OF EVIDENCE FROM DEFENDANT'S COMPUTER*

Before trial, defendant's counsel filed a motion to suppress evidence obtained from defendant's computer, pursuant to a search warrant, on the grounds the search warrant was not supported by probable cause. The trial court denied the motion.[4]

The evidence from defendant's computer, which the prosecution offered at trial, consisted of one letter to Nair (who was in custody at the time),[5] several letters that appeared to be suicide notes,[6] and one letter in which defendant confessed to committing the shooting.[7] Also, the prosecution offered evidence discovered during a forensic

---

[4] The Attorney General argues on appeal that the good faith exception to the exclusionary rule applies. Therefore, she argues, even if the search warrant was invalid for lack of probable cause, the evidence seized from defendant's computer was still admissible. "[E]vidence obtained pursuant to a facially valid search warrant subsequently determined to be invalid is admissible if the officers executed the search in objectively reasonable reliance upon the validity of a search warrant issued by a neutral magistrate." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1291; see *United States v. Leon* (1984) 468 U.S. 897, 922-923.) This issue was forfeited because it was not raised in the trial court in opposition to the motion to suppress. (*People v. Evans* (2011) 200 Cal.App.4th 735, 755-756 [inevitable discovery doctrine could not be raised by the Attorney General for the first time on appeal to argue in favor of the trial court's denial of the defendant's motion to suppress evidence]; see *U.S. v. Nicholson* (10th Cir. 2013) 721 F.3d 1236, 1246 [appellate court would not consider government's good faith exception argument because that argument was raised for the first time on appeal of the order denying the motion to suppress].)

[5] In the letter to Nair, defendant apologized to him for his being in jail, and told him to "stay strong" for the rest of the gang. Defendant told Nair the case against him was weak, and to "make sure you don't talk to the cops, and don't say anything that will make ur [*sic*] case or anyone elses case weak, or messed up." Defendant also told Nair not to say anything to anyone or it would "mess up everything."

[6] In one apparent suicide note, defendant told his friends and "homies" how much they meant to him, and to change their ways, and apologized for what he had done.

[7] The confession letter reads as follows: "To the pigs & media: [¶] First of all to the pigs, if youre reading this, I'm already dead, so go screw yourself. But I'm writing

8

analysis of defendant's computer, including Web page searches for "Venus Hyun," and a document that appeared to be an article, regarding Hyun's murder, from the Los Angeles Times.

"The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing. [Citations.] 'The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a

---

this to justify some things. You have Wilson Sun, Chakris, and Asheld Nair locked up for the murder of Venus Hyun. You have the wrong people locked up. I was the sole person involved in this, and you have my jacket to run gunpowder residue and my own DNA Im sure you can match up with the black cap you found at the scene outside the door of the 5th Wave Cafe. I will give you enough details of that night that only I know and that only—and that you can reference with the witnesses that night, so you know its me and Im not just trying to get my friends out of jail through my own escape. The gun used was a Colt 0.45 full size 1911, you wont find the gun because its swimming somewhere off the pier of Huntington Beach. The bullets were copper slugs. The table where Venus was sitting was the last table near the side door. I walked in the front door, was confronted by a waiter, that said they dont want trouble (he spoke Korean) I walked passed him and saw the table where they were sitting and unloaded about 5 rounds. Some guy I think a waiter grabbed me and went through the side door, thats when I shot him in the side (I think it was his left side). Thats where I dropped the cap, and then jumped in my truck and left the scene. So now you know how it happened. Now for the reason: You say they're not affiliated, do some homework, they're from FMS (Family Mobsters). Ive had personal shit with them for over a year now. Wilson, Chakris, and Ashild had no idea or knowledge of what I was going to do. When I heard FMS was inside, I just grabbed my gun and went inside, the homies didn't need to know, because it wasnt there beef, it was my personal beef. Venus wasnt my target, what happened to Venus was just a mistake that I choose not to live with anymore. Im sorry for what happened, and I lived every day until now trying to forget which I couldnt. To her family all I can say is I am so sorry and I hope my death will bring you some peace. Im very sorry. For the pigs: Since you have the wrong people locked up, do what should be done and let them go, like I said they had no idea what I was thinking or planning on doing." (Errors in original.)

9

crime will be found in a particular place.'  [Citation.]"  (*People v. Kraft* (2000) 23 Cal.4th 978, 1040-1041, quoting *Illinois v. Gates* (1983) 462 U.S. 213, 238.)

The search warrant was based on an affidavit of district attorney investigator Tim Day.  As is relevant here, the statement of probable cause includes the following:  "During my career as a police officer, I have contacted hundreds of gang members.  During these contacts, I spoke with them about their gang activity, gang crimes, other gangs, and gang members.  During these contacts, I have spoken with gang members about the methods and reasons for gang related crimes.  I have spoken with gang members about their lifestyle, culture, methods of operation, gang rivalries, methods of supporting the gang, motive for criminal activity, and their loyalty to the gang.  [¶] Through my experience, I have learned that most street gang members are known by street names or monikers to their fellow gang members.  I have also learned that gang members will frequently write their names, their monikers, or monikers of their associates on walls, furniture, misc. items of paper, both within and on their residences, and within/on vehicles they own or have been a passenger in.  [¶] It has also been my experience that most gang members keep photographs and photograph albums which depict/contain pictures of fellow gang members who are posing and giving hand gang signs which indicate gang activity or affiliation.  These photographs will often depict gang members or associates posing beside vehicles, which were used or involved in the commission of crimes, and gang members or associates at locations, which are known to be specific gang hangouts.  [¶] I have also learned that gang members will also maintain scrapbooks or keep newspaper articles, which describe crimes committed by the gang, or crimes committed against their gang or individual members.  Gang members have told me that the gang is like their family, and that fellow gang members are like their brothers and sisters.  Their membership is an important part of who they are, and their lifestyle.  As a result, many gang members maintain address books, lists of, or single references to other gang members.  [¶] . . . [¶] Through my experiences I have learned that gang

10

members will also have computers. Gang members have been known to write to email or write to each other and discuss crimes they have committed. They have also been known to store information such as writing about their gangs, information about crimes they may have committed, membership [rosters] and/or photographs. [¶] . . . [¶] . . . I am seeking a search warrant for permission to search the personal computer belonging to Stephenson KIM. Based on my past training and experience, I know that individuals tend to keep personal information on their computers for storing information and photographs, appointments, personal diar[ie]s, email communications and other communications. This type of evidence may indicate whether KIM had any communication with other gang members before and/or after the incident at the Fifth Wave Café; all of which is crucial to a homicide investigation and is believed that information such as this will be found on KIM's computer."

The affidavit in support of the search warrant also explained that the original search warrant for defendant's home, which was issued in September 2004 (at the same time as a warrant for defendant's arrest), asked that all computers and related equipment be seized. However, due to an oversight, defendant's computer was not seized at that time. In April 2005, a letter addressed to defendant at the Orange County Central Jail was intercepted. That letter explained that "Laura" or "L.B." intended to sell defendant's computer on eBay "[t]his week."

Additionally, the affidavit provided sufficient evidence connecting defendant to the commission of the crimes in question: "In August of 2004 I was assigned the task of trial preparation referenc[ing] a homicide that occurred in the city of Cypress on 3/13/04. . . . As part of my assignment, I have read police reports written by members of the Cypress Police Department regarding this homicide. I have also interviewed the lead detective, Timothy RAND. . . . [¶] . . . [¶] During the course of his investigation, Investigator RAND[] identified Stephenson Choi KIM, DOB: 9/02/98, as the person who shot the persons inside the Fifth Wave Café on 3/13/04. On 9/29/04

11

Investigator RAND obtained an arrest warrant for KIM and a search warrant for his home . . . ." Defendant did not argue in the motion to suppress, or in his appellate briefs, that there was not probable cause supporting the arrest warrant, or that there was not probable cause to connect him to the crimes in question; the issue has therefore been conceded.

We conclude that the affidavit in support of the search warrant established probable cause to seize and search defendant's computer, and the trial court, therefore, did not err in admitting into evidence the documents and other information found on that computer. "The affidavit must establish a nexus between the criminal activities and the place [or thing] to be searched. [Citation.] 'The opinions of an experienced officer may legitimately be considered by the magistrate in making the probable cause determination.' [Citation.] However, an affidavit based on mere suspicion or belief, or stating a conclusion with no supporting facts, is wholly insufficient. [Citation.]" (*People v. Garcia* (2003) 111 Cal.App.4th 715, 721.)

The affidavit, here, established a nexus between defendant's computer and the gang-related crime committed at the Fifth Wave Café. Based on his own experience with gang members and on communications with other peace officers, Day stated that gang members keep scrapbooks and collect newspaper articles detailing their gang crimes, keep photographs of themselves and other gang members, and write their gang monikers on various items in their possession. Day further stated that gang members maintain lists of other gang members and information relevant to their gang membership. Finally, Day stated that gang members own computers and use those computers to send e-mails to other gang members regarding details of their crimes and to store gang-related information. That computers are ubiquitous in everyday life is hardly a matter that can escape the knowledge of those issuing search warrants. Based on the sworn statements in the affidavit, the judge who issued the search warrant had a substantial basis for concluding a fair probability existed that the warrant for the seizure of defendant's

12

computer would uncover evidence related to the Fifth Wave Café shooting. The need for the immediate issuance of the warrant was amply established by the information that an acquaintance of defendant's was planning to sell the computer on eBay that week. The affidavit was not based merely on suspicion or belief, nor did it contain only a conclusion without any supporting facts.[8]

## II.

### *REFUSAL TO INTRODUCE VIDEOTAPE EVIDENCE*

Defendant argues his federal constitutional right to present a defense was violated when the trial court refused to permit him to offer into evidence a videotape of an interview of Ronald. A police detective videotaped an interview with Ronald on April 15, 2004, about one month after the shooting and three weeks after Ronald was released from the hospital. During the interview, Ronald was shown a six-pack photographic lineup, and identified Sun's photo as the person who looked most like the shooter. Ronald also told the detective he saw the shooter run out the back door of the café and toward a white Nissan Altima. On April 20, Ronald was again interviewed by police detectives, and was shown a different six-pack photographic lineup. Ronald again identified Sun's photo, stating he was 90 percent sure Sun was the shooter. The trial court denied defendant's motion to introduce Ronald's videotaped statements.

Defendant concedes that Ronald's videotaped statements were hearsay, not subject to any statutory exception. He argues, however, that his federal constitutional right to present a defense was denied by the trial court's refusal to admit Ronald's hearsay statements because those statements were "critical, reliable, and exculpatory evidence."

---

[8] The Ninth Circuit Court of Appeals's recent opinion in *U.S. v. Underwood* (9th Cir. 2013) 725 F.3d 1076 does not change our analysis. The Ninth Circuit concluded that a search warrant lacked probable cause because the affidavit "includes only two facts, foundationless expert opinion, and conclusory allegations." (*Id.* at p. 1082.)

13

"Few rights are more fundamental than that of an accused to present witnesses in his own defense. [Citations.] In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to [the defendant's] defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." (*Chambers v. Mississippi* (1973) 410 U.S. 284, 302 (*Chambers*).)

In *Chambers*, *supra*, 410 U.S. at page 285, the defendant was charged with shooting and killing a police officer. Another man, Gable McDonald, initially confessed to the shooting, but later repudiated his confession. (*Id.* at pp. 287-288.) The defendant called McDonald as a witness in his defense, but was prevented from impeaching McDonald with his earlier confession by Mississippi's common law rule that a party may not impeach his or her own witness. (*Id.* at pp. 295-296.) The trial court also denied the defendant's request to question three independent witnesses, who would have testified that McDonald had confessed to the shooting on separate occasions soon after the crime, because Mississippi law did not make declarations against one's penal interest an exception to the hearsay rule. (*Id.* at pp. 298-299.)

"The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability. First, each of [the hearsay declarant]'s confessions was made

14

spontaneously to a close acquaintance shortly after the murder had occurred.  Second, each one was corroborated by some other evidence in the case . . . .  The sheer number of independent confessions provided additional corroboration for each.  Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest.  [Citations.] . . . Finally, if there was any question about the truthfulness of the extrajudicial statements, [the hearsay declarant] was present in the courtroom and was under oath.  He could have been cross-examined by the State, and his demeanor and responses weighed by the jury." (*Chambers*, *supra*, 410 U.S. at pp. 300-301, fn. omitted.)

The rule of *Chambers* does not require that Ronald's statements be admitted.  "[T]he holding of *Chambers*—if one can be discerned from such a fact-intensive case—is certainly not that a defendant is denied 'a fair opportunity to defend against the State's accusations' whenever 'critical evidence' favorable to him is excluded."  (*Montana v. Egelhoff* (1996) 518 U.S. 37, 53.)  When we consider the factors analyzed by the Supreme Court in *Chambers*, we find no abuse of the trial court's discretion in determining there was not considerable assurance of the reliability of Ronald's statements.  The statements were not made spontaneously or to a close acquaintance, but rather to a police officer during an interview.  Ronald's accusation of Sun was not corroborated by any other evidence in the case (and indeed was contrary to defendant's theory that Robin Kim was the shooter).  Ronald's statements were not self-incriminatory or against his interest.  Finally, Ronald was not subject to cross-examination because he had died before trial.  (Ronald died of causes unrelated to the shooting.  His statements were not dying declarations, and, therefore, were not made admissible by Evidence Code section 1242.)

Many California cases have limited the holding of *Chambers*.  "Exclusion of the inadmissible hearsay at issue did not violate defendant's constitutional rights.  As we recently explained, the United States Supreme Court has never suggested that states

15

are without power to formulate and apply reasonable foundational requirements for the admission of evidence. [Citations.] Foundational prerequisites are fundamental, of course, to any exception to the hearsay rule. [Citation.] Application of these ordinary rules of evidence to the alleged drug-related components of the proffered testimony did not impermissibly infringe on defendant's right to present a defense. [Citation.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 724-725.)

In *People v. Ayala* (2000) 23 Cal.4th 225, 266, the defendant sought to introduce at trial the hearsay statements of two people who had been interviewed by investigators, but who had died before they could testify at trial. The statements of those individuals would have been exculpatory. (*Id.* at pp. 267-268.) The appellate court affirmed the trial court's order denying the defendant's motion to introduce the hearsay statements. "There is . . . no proper exception to the hearsay rule that would have permitted defendant to introduce [the two individuals'] statements. There are no indicia of reliability surrounding those statements . . . ." (*Id.* at p. 269.)

As in *People v. Ayala*, there was no particularized guarantee of the trustworthiness of Ronald's statements, his statements were not against his interest, and the statements were not spontaneous. (See *People v. Ayala*, *supra*, 23 Cal.4th at p. 270, citing *State v. Bunyan* (1998) 154 N.J. 261, 271 [712 A.2d 1091, 1095-1096].) Therefore, the trial court did not err in refusing to admit Ronald's hearsay statements, or to create a new exception to the hearsay rule to admit them.

III.

*KILL ZONE THEORY OF LIABILITY*

Defendant argues that the trial court erred by instructing the jury on a kill zone theory of liability with regard to attempted murder.[9] Unlike murder, the crime of

---

[9] The jury was instructed with CALCRIM No. 600, which reads, in relevant part, as follows: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or 'kill zone.' [¶] In order to convict

16

attempted murder requires proof that the defendant had a specific intent to kill.  (*People v. Lee* (2003) 31 Cal.4th 613, 623.)  The intent to kill a specific person cannot be transferred to another victim, who is not actually killed, to support a conviction for attempted murder.  (*People v. Bland* (2002) 28 Cal.4th 313, 331.)  A defendant can, however, be convicted of the attempted murder of a victim who was not the defendant's intended target if the victim is within the area referred to as the kill zone:  "[A] shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim . . . as the means of accomplishing the killing of that victim.  Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm."  (*People v. Smith* (2005) 37 Cal.4th 733, 745-746.)

"The kill zone theory thus does *not* apply if the evidence shows only that the defendant intended to kill a particular targeted individual but attacked that individual in a manner that subjected other nearby individuals to a risk of fatal injury.  Nor does the kill zone theory apply if the evidence merely shows, in addition, that the defendant was aware of the lethal risk to the nontargeted individuals and did not care whether they were killed in the course of the attack on the targeted individual.  Rather, the kill zone theory applies only if the evidence shows that the defendant tried to kill the targeted individual *by killing everyone in the area in which the targeted individual was located*.  The defendant in a kill zone case chooses to kill *everyone* in a particular area as a means of

the defendant of attempted murder of Jean Lee, Michael Paek, John Chung, Ronald Woodhead, Richard Woodhead, and John Yoo, the People must prove that the defendant not only intended to kill Venus Hyun, but also intended to kill everyone within the kill zone.  [¶] If you have a reasonable doubt whether the defendant intended to kill Venus Hyun, or intended to kill everyone in the kill zone, then you must find the defendant . . . not guilty of the attempted murder of Jean Lee, Michael Paek, John Chung, Ronald Woodhead, Richard Woodhead, and John Yoo."

17

killing a targeted individual within that area. In effect, the defendant reasons that he cannot miss his intended target if he kills *everyone* in the area in which the target is located. [¶] The kill zone theory consequently does not operate as an exception to the mental state requirement for attempted murder or as a means of somehow bypassing that requirement. In a kill zone case, the defendant does not merely subject everyone in the kill zone to lethal risk. Rather, the defendant *specifically intends* that *everyone* in the kill zone die. If some of those individuals manage to survive the attack, then the defendant— having specifically intended to kill every single one of them and having committed a direct but ineffectual act toward accomplishing that result—can be convicted of their attempted murder." (*People v. McCloud* (2012) 211 Cal.App.4th 788, 798.)

The kill zone theory does not apply if the defendant does not have a specific target in mind. (*People v. Stone* (2009) 46 Cal.4th 131, 138.) The jury in this case should not have been instructed on the inapplicable kill zone theory of liability. The erroneous inclusion of the kill zone theory instruction, however, was harmless. The prosecution's theory of the case was that defendant, believing the table at the back of the Fifth Wave Café to be occupied by members of a gang with which defendant had a "beef," entered the café with a loaded gun, intending to kill everyone at the table. Substantial evidence was offered in support of this theory. The jury was instructed generally, and correctly, regarding the crime of attempted murder.[10]

"An indiscriminate would-be killer is just as culpable as one who targets a specific person." (*People v. Stone*, *supra*, 46 Cal.4th at p. 140 [the defendant was convicted of attempted murder for firing a single shot into a group of 10 people, even though the prosecution did not prove the defendant intended specifically to kill the person he shot].) Despite the incorrect instruction on the kill zone theory, there was no

---

[10] We note that even when arguing the kill zone theory to the jury, the prosecutor argued only that the theory applied to John Yoo and Richard, who were not hit by any bullets.

18

prejudicial error because the evidence supported defendant's conviction on all counts of attempted murder.

## IV.

### *INSUFFICIENCY OF THE EVIDENCE—COUNTS 6 AND 7*

Defendant also argues there was insufficient evidence supporting the convictions for the attempted murders of Richard and Yoo, who were not actually shot during the incident. Defendant's argument is based on the recovery of a total of six cartridge casings at the scene—four from inside the café, and two from outside the café. Therefore, defendant contends, only six shots were fired, and the evidence only supports four counts of attempted murder, committed against the four individuals who were actually shot.[11]

The number of casings recovered at the scene, however, is not determinative of the number of shots defendant fired with the intent to kill. Only five bullets or bullet fragments were ever recovered. More shots were fired than bullets or fragments recovered, and from this fact the jury could reasonably infer more shots might have been fired than casings recovered.

More importantly, the testimony of the witnesses supports the guilty findings on all the attempted murder counts. Robin Kim testified he heard five or six gunshots. Nair testified he heard six or seven shots. Lee testified five or more shots were fired. Yoo testified at least five or six shots were fired. Chung testified there were at least eight shots, "[a]ll fired at the same time," and there could have been more. Park, the café waiter, heard between five and seven shots. There was also testimony that Ronald chased defendant after the shots were fired inside the café, and was then shot in the abdomen.

---

[11] Ronald was shot twice. Hyun, Lee, Paek, and Chung were each shot a single time.

19

From all this evidence, there was support for a finding that defendant fired at least eight shots inside the café, and then fired two more shots at Ronald as he chased defendant outside the café. Based on this evidence, there was ample support for defendant's convictions on all the attempted murder charges, including those for the victims who were not actually struck by a bullet.

## V.

### *RESTITUTION*

Defendant asks that the written restitution order and the abstract of judgment be amended to reflect that restitution—which was ordered in the amount of $14,500—be paid jointly and severally with defendant's codefendants (who pleaded guilty before trial). The Attorney General concedes it would be appropriate to amend the restitution order and the abstract of judgment in this manner.

The trial court has the authority to direct that a victim restitution order be paid jointly and severally by multiple defendants. (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535.) Indeed, the failure to make a restitution order joint and several when the same amount of restitution has been ordered against multiple defendants convicted of committing the same crime could result in unjust enrichment of the victim.

In this case, at the time of defendant's sentencing hearing, the trial court stated that it would order restitution to be paid jointly and severally if the codefendants' restitution orders had been made joint and several as well. However, no one could remember whether that had been the case. The court orally imposed a restitution order in the amount of $14,500 against defendant, and directed the prosecutor to prepare a written restitution order. The written order and the abstracts of judgment, like the oral order, did not specify that the restitution order was made jointly and severally.

While it would be appropriate to make the restitution order joint and several if restitution of $14,500 was also imposed against the codefendants, we have no

20

information in the record as to whether that was the case. Therefore, we cannot modify the restitution order and abstracts of judgment as requested. Defendant may make an appropriate motion in the trial court and present evidence that his codefendants' restitution orders were made in the same amount as his restitution order, and that those orders were made joint and several.

## VI.

### *PAROLE REVOCATION RESTITUTION FINE*

The trial court assessed a $1,000 parole revocation restitution fine against defendant; the fine was suspended unless defendant violated parole. Defendant argues, and the Attorney General concedes, that the parole revocation fine should be stricken because defendant was sentenced to life in prison without the possibility of parole. We disagree.

In addition to one term of life in prison without the possibility of parole, and multiple terms of life in prison with the possibility of parole, defendant was sentenced to a determinate sentence of 40 years. Under these circumstances, the parole revocation fine under Penal Code section 1202.45 is mandatory. In *People v. Brasure* (2008) 42 Cal.4th 1037, 1075, the California Supreme Court held as follows: "Defendant here, in addition to his death sentence, was sentenced . . . to a determinate prison term under [Penal Code] section 1170. [Penal Code s]ection 3000, subdivision (a)(1) provides that such a term 'shall include a period of parole.' Section 1202.45, in turn, requires assessment of a parole revocation restitution fine '[i]n every case where a person is convicted of a crime and whose sentence includes a period of parole.' The fine was therefore required, though by statute and the court's order it was suspended unless and until defendant was released on parole and his parole was revoked. [Citation.] [¶] *People v. Oganesyan* (1999) 70 Cal.App.4th 1178 . . . , upon which defendant relies, is distinguishable as involving no determinate term of imprisonment imposed under

21

section 1170, but rather a sentence of life without the possibility of parole for first degree special circumstance murder and an indeterminate life sentence for second degree murder.  [Citation.]  As in *Oganesyan*, to be sure, defendant here is unlikely ever to serve any part of the parole period on his determinate sentence.  Nonetheless, such a period was included in his determinate sentence by law and carried with it, also by law, a suspended parole revocation restitution fine."

*People v. McWhorter* (2009) 47 Cal.4th 318, which the Attorney General cites, does not compel a different result.  In that case, the Supreme Court held that a parole revocation restitution fine must be stricken because the defendant's sentence did not include a period of parole.  (*Id.* at p. 380.)[12]

The Attorney General contends that the trial court stayed execution of defendant's determinate sentence.  The appellate record, however, reflects that while execution of the determinate sentence on count 8 (street terrorism) was stayed, two 20-year determinate terms for the firearm sentencing enhancements on counts 6 and 7 were imposed and not stayed.  The chance that defendant will ever be paroled is remote.  However, as in *People v. Brasure*, a period of parole was included in defendant's sentence by law, and the imposition of the parole revocation restitution fine was therefore mandatory.  Defendant cannot be prejudiced by the assessment of the parole revocation restitution fine, which will only become payable if he begins serving a period of parole, and that parole is revoked.  (*People v. Brasure*, *supra*, 42 Cal.4th at p. 1075.)

_____

[12]  The defendant had been sentenced to death.  (*People v. McWhorter*, *supra*, 47 Cal.4th at p. 324.)

DISPOSITION

The judgment is affirmed.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.